# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|                     |     |                      |
|---------------------|-----|----------------------|
| STATE OF DELAWARE   | )   |                      |
|                     | )   |                      |
| v.                  | )   | Case No. 1510004179  |
|                     | )   |                      |
| RYDELL S. MILLS,    | )   |                      |
|                     | )   |                      |
| Defendant.          | )   |                      |

Submitted: July 28, 2016
Decided: August 25, 2016

Upon Defendant's Motion to Suppress -
**GRANTED**

## OPINION

Matthew B. Frawley, Esquire, Deputy Attorney General, and Mark Denney, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, *Attorneys for the State of Delaware.*

Eugene J. Maurer, Jr., Esquire and Allison S. Mielke, Esquire, Wilmington, Delaware, *Attorneys for Defendant.*

**STREETT, J.**

Having considered Rydell Mills' (the "Defendant's") Motion to Suppress his Statement, the State's Response, a suppression hearing, the State's Supplemental Briefing, a transcript and tape of Defendant's statements, statutory and decisional law, and the record of this case, Defendant's Motion is **GRANTED**.

## History

Between February 2008 and October 2008, four shootings in Wilmington were traced back to the same gun, [1] a Ruger nine millimeter.[2] Two of these shootings were murders. By February 23, 2009, Defendant had pled guilty to charges involving the two non-fatal shootings. The murders were unsolved and the police had not made any arrests for the murders as of February 2009.

- Shooting 1: February 3, 2008 – Jerome Green murder. The victim was shot in the back once as he walked down the street with his nine year old daughter on Super Bowl Sunday. In August 2008, a witness implicated Defendant's brother but the brother was incarcerated at the time of the shooting.[3]

- Shooting 2: March 11, 2008 – shooting of Dosh Coverdale.

  On December 2, 2008, Defendant pled guilty to Reckless Endangering in the First Degree.

---

[1] For purposes of this opinion, "gun" and "murder weapon" will be used interchangeably.

[2] Statement Transcript at 4 (hereinafter "Tr."). In reviewing the Statement Transcript, the Court noted several discrepancies and therefore used the audio recording of the interview to reconcile the Statement Transcript.

[3] Tr. at 33-34. Defendant told police that his brother never had access to the gun because he (the brother) was incarcerated when Defendant got the gun.

On February 6, 2009, the Court sentenced Defendant to three years at Level V, suspended after one year for two years at Level IV, suspended after six months for eighteen months at Level III.

- Shooting 3: July 31, 2008 – shooting of Joshua Graham. Defendant surrendered to the police on August 3, 2008, was incarcerated, remained incarcerated, and began serving a Level V sentence for Shooting 2 on February 6, 2009.

  On February 23, 2009, Defendant pled guilty to Assault in the Second Degree and Possession of a Firearm During the Commission of a Felony in connection with Shooting 3.[4]

  On May 1, 2009, the Court sentenced Defendant to five years at Level V, suspended after three years for two years at Level IV, suspended after six months, followed by eighteen months at Level III for Shooting 3. On March 26, 2013, Defendant's sentence was modified to suspend the Level V term after two years.[5]

- Shooting 4: October 8, 2008 – Stephen Ashley murder. Defendant was incarcerated at the time of Shooting 4.

On March 11, 2009, the chief investigators from Shooting 1 (Detective George Pigford) and Shooting 4 (Detective Gary Tabor) went with Detective Pete Lecchia to the prison where Defendant was waiting to be sentenced for Shooting 3 (and was serving his sentence for Shooting 2).

The detectives interviewed Defendant for one and a half hours. One hour into the interview, Defendant admitted that he had the gun (the murder weapon)

---

[4] The Possession of a Firearm by a Person Prohibited charge was dismissed pursuant to the plea agreement.

[5] On July 22, 2014, Defendant was found in violation of his probation and was sentenced to two years eight months at Level V, suspended after two years for one year at Level IV, suspended after six months for one year at Level III.

3

around the time of Shooting 1 ("Statement A"). After that admission, the detectives advised Defendant of his *Miranda* rights.[6] Defendant continued to talk about the gun and further incriminated himself as to the events of Shooting 1 ("Statement B").

Six years later, on October 12, 2015, a grand jury indicted Rydell Mills on the charges of Murder in the First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Reckless Endangering in the First Degree, and other related offenses arising from the shooting death of Jerome Green that occurred on February 3, 2008. Defendant is awaiting trial.

Defendant seeks to suppress all statements given to the police on March 11, 2009 during an interview held at the prison.

### The Interview

On March 11, 2009, three officers from the Wilmington Police Department ("WPD") went to Howard R. Young Correctional Institution and requested access to the Defendant. Corrections officers consented and brought Defendant to an approximately 10x10 office within the prison where the three detectives were waiting. Defendant was seventeen years old at the time of the police interview.

Detective Pigford began by introducing the other officers and telling Defendant that:

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

We just want to talk to you about a couple things...there is nothing that – that you're directly involved in or anything like that. You're not. Obviously, we're – we're not here to try to get you in any kind of trouble or anything like that... I'm trying to find out some information that you might have...[7]

The detective then continued:

Okay? Now if you don't know anything, that's fine and we can part as friends and we'll all move on. Okay? Now, I mean, do you have any problem talking to me?

The detective also told Defendant that he would *not* give him his *Miranda* warnings. The detective said:

Well. Mr. Mills, I want to explain one more thing to you and I know you've been interviewed by the police before a couple other occasions and you'll notice one thing that – that I didn't do in the beginning of – of talking to you was I didn't. I never read you your rights. Okay? And I'm not going to. Do you understand what that means?[8]

In addition to not providing *Miranda* warnings,[9] the detective did not indicate to the Defendant how long the interview was expected to last or the topic(s) that they intended to cover. Furthermore, the detective did not tell Defendant that he could leave and did not have to answer any questions. Instead, the detective began with several minutes of conversational questioning before the three officers proceeded to repeatedly ask Defendant, for approximately ninety minutes, about the provenance, use, and possible transfer of the gun (the known murder weapon) to others between February and October 2008. During this first

---

[7] Tr. at 1.

[8] Tr. at 5-6.

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

hour, the police officers reiterated several times that whatever Defendant said would not be used against him.

After approximately sixty minutes of giving differing versions of the whereabouts of the gun during those months, the Defendant admitted that he may have had the gun as early as February 2008 and that his brother never had access to it (Statement A).[10] One of the officers then advised Defendant of his *Miranda* rights. The police did not ask Defendant to sign a written waiver:

> Detective: All right. Well, I want to get. I want to talk [to] you a little more in depth. Okay? About some things. Um, but, and for this part I am going to read you your rights. Okay? Just not – not saying that you're in trouble, okay? I just don't know what you may or may not say to me. So I want to make sure that I, that you're protected. Okay? Um. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to an attorney. If you can't afford an attorney, one will be appointed to represent you. Okay? You have the right to stop asking answering questions at any time and have a lawyer present. Do you understand? Um. The things I want to talk about, I still don't believe that you're involved in. Okay? But, because I don't know, I can't foresee the future, I don't know what you're going to say to me. What you may or may not say to me. Um. So, but, it's pretty important that we talk. Okay? Um. With those rights in mind, you've had your rights read to you before.
>
> Mills: Uh huh.
>
> . . .
>
> Detective: Okay. I know it might have been [Detective] Brock, but you, you're familiar with that process and everything and how it goes. Um. Is it all right if I discuss with you, if we talk about these other things? That's all right with you? Yes? You got to say yes, please.
>
> Mills: Yeah.[11]

---

[10] Tr. at 33. Defendant's admission to getting the gun "between February and April" was in response to the detective's question about whether Defendant shot the gun on New Years.

[11] Tr. at 35-36.

6

Then, Defendant, over the course of an additional thirty minutes, presented changing and conflicting stories about who had and used the murder weapon in Shooting 1 (the death of Jerome Green).

Defendant eventually told the police that he had the gun around the time of Shooting 1, gave it to "Hakeem" to "handle something," Hakeem was "getting ready to rob somebody" because someone in the store pulled out a lot of money and "we said all right," when "all of a sudden, it was boom, boom, boom," Hakeem just started shooting, and then Defendant and Hakeem ran in different directions (Statement B).[12]

Shortly after Defendant began to further incriminate himself in Statement B, a prison employee knocked on the office door and interrupted the interview. The prison employee (unidentified in the transcript and who sounded like a female on the tape) entered and stated "I know you all had already started talking and I guess agreed to it. I just need this [form] filled out, where he's permitting this interview."[13] The prison employee wanted the police to sign a form before the police left and the employee would witness the signature.[14]

---

[12] Tr. at 76, 79-81.

[13] Tr. at 44. The tape and transcript contain an unidentified person who seems to be addressing her comments to one of the detectives. *Id.*

[14] The form has not been identified and has not been produced. It is unclear if Defendant was expected to sign or did sign the form.

7

> Unknown: I know you all had already started talking and I guess agreed to it. I just need this filled out, where he's permitting this interview.
> Detective: Oh, okay. I got you.
> Unknown: To take place.
> Detective: That's fine.
> Unknown: Okay, before you leave.
> Detective: Yeah, that's fine.
> Unknown: And you just put your name here and then you all print you know, agency and then I'll witness it after you're done.
> Detective: Okay.
> Unknown: Okay?
> Detective: Okay. Thank you for your help.[15]

The prison employee then left the office, the police continued to be in charge of Defendant, and the police resumed their questioning of Defendant.

At the end of the interview, the police suggested to Defendant that he conceal the substance of his statement from other inmates:

> Detective: If we walk out of this room and then and you go back there, what are you going to tell him we talked about?
> Mills: Who?
> Detective: People that asked you when you were sitting down, 'cause it looked. You know, you know what I'm saying.
> Mills: I don't know. Just hear about me about something that I ain't, hm, I ain't got nothing to do with.
> Detective: Can you tell him we asked and asked and asked and you never said shit?
> Mills: Yeah.[16]

The interview then concluded, the police relinquished control of Defendant, and corrections officers then took charge of Defendant. The corrections officers apparently escorted Defendant back into the interior (non-office part) of the prison where he was returned to his prison routine and remained.

---

[15] Tr. at 44.

[16] Tr. at 85.

## Parties' Contentions

### The Defense:

On February 26, 2016, Defendant, through his attorney, filed a Motion to Suppress the entirety of Defendant's ninety-minute statement (Statements A and B). Defendant asserts that the interview violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel.

Specifically, Defendant contends that the need for *Miranda* warnings prior to beginning the interview was "clearly indicated,"[17] the police misled Defendant when they told him several times[18] that nothing he said would be used against him, and the questioning by the police in the absence of Defendant's plea counsel (in Shooting 3) while he was awaiting sentencing for Shooting 3 violated his Constitutional rights.

The Defense avers that the police should have advised Defendant of his *Miranda* rights prior to beginning the interview with Defendant because the purpose of this interview was to "elicit information regarding the Defendant's participation, or lack thereof, in [a] homicide,"[19] the Defendant was "otherwise 'in

---

[17] Def.'s Mot. to Suppress Statement, Feb. 24, 2016, at 7 (citing *Missouri v. Seibert*, 542 U.S. 600, 604 (2004)).

[18] Tr. at 6, 23, 31.

[19] Def.'s Mot. to Suppress Statement, at 2.

9

custody' with regard to the other offenses,"[20] the interview focused on the firearm that the police knew was used as the murder weapon in Shooting 1 and that Defendant admitted possessing (in Shooting 3), the interview was intended to persuade Defendant to change his prior statement that he had thrown the gun in the river after Shooting 3,[21] and that the police intended to obtain incriminating information concerning Shooting 1.

The Defense also maintains that the police officers' assurances to Defendant, that "nothing you say can ever be used against you," induced Defendant to admit to possession of the murder weapon around the time of Shooting 1 (Statement A) which then eventually triggered the police to advise Defendant of his *Miranda* rights and elicit Statement B. The Defense cites *Missouri v. Siebert*[22] to support its claim that this was a violation of Defendant's Fifth Amendment right against self-incrimination.[23]

The Defense further argues that a Sixth Amendment violation occurred because Defendant was represented by counsel concerning Shooting 3, Defendant

---

[20] *Id.* at 3.

[21] *Id.* at 4.

[22] *Missouri v. Siebert*, 542 U.S. 600 (2004).

[23] The Defense does not find fault with the content of the *Miranda* warnings that the police recited although the Defense suggests that the waiver itself was ambiguous or forced. "Is it all right if I discuss with you, if we talk about these other things? That's all right with you? Yes? You got to say yes, please." Tr. at 36.

had not yet been sentenced for that shooting, and he would be represented by counsel at sentencing (for Shooting 3) in the near future.

**The State:**

The State responded that the police were investigating the gun, Defendant was not a suspect in Shootings 1 or 4, the right to counsel is "offense-specific"[24] and, as such, the police did not need to advise Defendant of his *Miranda* warnings (when it elicited Statement A) until "it became clear that he may touch upon admissions of criminality in a case the police were actually investigating."[25]

The State further asserted that the Defendant was not "in custody" because the objective circumstances and the totality of the circumstances reflect that he was escorted from one room of his living situation (prison) to another room within the prison – an office in the same correctional facility; he did not experience any physical deprivation (he had eaten lunch); he agreed to talk; the questioning was relaxed, non-threatening and informal; the interview was not excessively lengthy; he was not restrained; the police told him that it was fine if he did not know anything; he was not arrested; the officers told him that they did not want to talk about Shooting 3; and they told him that they were not there to get him in trouble.

---

[24] State's Response, Apr. 1, 2016, at 3.

[25] *Id.*

The State also added that "the Defendant was read *Miranda* warnings at the proper time – once it became clear that he may touch upon admission of criminality in a case the police were actually investigating."[26] The State stressed that the Sixth Amendment right to counsel "in these settings" is offense specific[27] and there was no custodial interrogation based on objective circumstances – including the fact that Defendant had prior criminal experiences.[28] The State also provided an analysis of relevant factors[29] to consider and noted that police assurances that his pre-*Miranda* statement (Statement A) would not be used were honored because Statement A was not used to "aggravate [his] pending sentence on his closed case, or tie him to [Shooting 4]".[30]

On July 22, 2016, a suppression hearing was held. The lead investigator for Shooting 1 (Detective Pigford) and the lead investigator for Shooting 4 (Detective Tabor) testified. At the conclusion of the hearing and argument, the Court gave the State and the Defense the opportunity to file supplemental briefing.

---

[26] *Id.*

[27] *State v. Johnson*, 2005 WL 1953066, at *2 (Del. Super. June 29, 2005).

[28] State's Response, at 3 ("Rydell Mills was 16 years old at the time of the interview, had been arrested several times, and was not a newcomer to the criminal justice system."). It is unclear whether the State represents that Defendant was arrested prior to the incidents involving the gun used in the four shootings.

[29] *Howes v. Fields*, 132 S.Ct. 1181 (2012).

[30] State's Response, at 11 (however, Defendant's case was not "closed" – he was awaiting sentencing. Moreover, he was incarcerated at the time of Shooting 4).

12

The State filed a supplemental brief, focused on Defendant's Sixth Amendment right to counsel, and argued that Statement B was admissible because it was not the product of a two-tiered investigation tactic.

## Analysis

Having considered all of the above, the Court finds that Defendant's Fifth Amendment privilege against self-incrimination was violated when he was interrogated for one hour without *Miranda* warnings thereby rendering Statement A inadmissible. The Court also finds that the *Miranda* warnings eventually given were not effective under the totality of the circumstances and that Defendant's post-*Miranda* statement (Statement B) is inadmissible and must be suppressed.[31]

The law is clear that the Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself."[32] In *Miranda v. Arizona*, the U.S. Supreme Court extended the privilege against self-incrimination to the "in-custody interrogation of a person accused or suspected of a crime."[33] If a suspect is in custody, then the police

---

[31] The Court does not find a Sixth Amendment violation. "[T]he Sixth Amendment protects an accused with the right of counsel only for charges that have been officially commenced against him, but may not be used to chill investigatory efforts in a separate criminal investigation." *State v. Johnson*, 2005 WL 1953066, at *2. "Therefore, if the Sixth Amendment right attaches to one charge, it cannot be used by a defendant to prevent police interrogation into other crimes in which he is merely a suspect." *Id.* Here, the Sixth Amendment right attached to the specific offense of Shooting 3.

[32] *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010).

[33] *DeJesus v. State*, 655 A.2d 1180, 1189 (1995) (citing *Miranda v. Arizona*, 384 U.S. at 436).

13

should advise that individual of his *Miranda* rights prior to custodial interrogation.[34] The Court finds that the police conducted an interrogation with Defendant, a criminal suspect, while he was in custody. Therefore, *Miranda* warnings were required before the interrogation began.

In *State v. Mattison*, cited by the State, the Court defined custody as depriving a defendant of his freedom of action in any significant way.[35] "In the absence of a formal arrest, the determination of whether there has been a restraint on the suspect's freedom of movement equivalent to a formal arrest turns on whether a reasonable person in the suspect's position would have believed himself in custody or deprived of his freedom in any significant way."[36] It is well established that the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[37] The subjective intent

---

[34] *Miranda v. Arizona*, 384 U.S. at 436; *see also Marine v. State*, 607 A.2d 1185, 1192 (Del. 1992) ("[L]aw enforcement officials may not constitutionally subject citizens to custodial interrogation without their having been first advised of certain rights protective of their Fifth Amendment privilege against self-incrimination.").

[35] *State v. Mattison*, 2005 WL 406342, at *1 (Del. Super. Feb. 4, 2005).

[36] *State v. Sumner*, 2003 WL 21963008, at *11 (Del. Super. Aug. 8, 2003) (citing *Berkemer v. McCarthy*, 468 U.S. 420, 442 (1984)).

[37] *Stansbury v. California*, 511 U.S. 318, 323 (1994).

of the interrogating officers is not relevant[38] to finding whether Defendant voluntarily elected to waive his right to remain silent.

An objective standard, rather than a subjective standard, has been adopted because it "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does [it] place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question."[39] Police officers are not asked to consider psychological factors, such as a suspect's past experiences and the likelihood of a reasonable person with those experiences feeling free to leave an interview, when deciding whether a suspect should be given *Miranda* warnings.[40] "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable person in the suspect's position would have understood his situation."[41]

---

[38] *See Missouri v. Siebert,* 542 U.S. at 616 n.6 (2004) ("Because the intent of the officer will rarely be as candidly admitted as it was here…the focus is on facts apart from intent that show the question-first tactic at work.").

[39] *Marine v. State,* 607 A.2d 1185, 1193 (Del. 1992) (citing *Berkemer v. McCarty,* 468 U.S. 420, 442 n.35 (1984)).

[40] *Yarborough v. Alvarado,* 541 U.S. 652 (2004) (holding that reliance on a 17-year-old defendant's prior history with law enforcement in determining whether he was "in custody" was improper); *but see J.D.B. v. North Carolina,* 564 U.S. 261 (2011) (holding that a juvenile's age, if known to the officer at the time of questioning, is relevant to the custody analysis).

[41] *Berkemer v. McCarthy,* 468 U.S. at 421-22; *see also Stansbury v. California,* 511 U.S. 318, 323 (1994).

Furthermore, the U.S. Supreme Court established, in *Howes v. Fields,* that there is no categorical rule for determining whether incarceration alone constitutes custody for the purposes of *Miranda.*[42] In a prison setting, custody is "some act or circumstance that places additional limitations on the prisoner."[43] A coercive environment alone is not sufficient to convert a noncustodial situation into one in which *Miranda* applies.[44] An additional limitation or restraint would "depen[d] upon whether [incarceration] exerts the coercive pressure that Miranda was designed to guard against – the 'danger of coercion [that] results from the interaction of custody and official interrogation.'"[45]

Although there is no *per se* custody rule for prison inmates, the Court finds that the Defendant here was in custody based on a consideration of the relevant factors set forth in *Howes v. Fields.* Such factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."[46]

---

[42] *Howes v. Fields,* 132 S.Ct. at 1187.

[43] *In re B.C.,* 167 N.H. 338, 343 (2015).

[44] *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977).

[45] *Howes v. Fields,* 132 S.Ct. at 1188 (quoting *Maryland v. Shatzer,* 559 U.S. 98, 112 (2010)).

[46] *Id.* at 1189 (internal citations omitted); *see also Oregon v. Mathiason,* 429 U.S. 492, 495 (1977).

Here, unlike in *Howes v. Fields*, the Defendant was a juvenile and had been transferred from the juvenile detention center to the adult prison three months before he was interviewed. Defendant, without prior warning, had his prison routine abruptly interrupted and was removed from his usual prison surroundings by prison staff and turned over to three Wilmington police officers who were waiting for him in an office located on prison property. The police gave no indication as to the anticipated length of the interview, or that he did not have to answer questions, or that he could leave the office and return to the cellblock. There was nothing to indicate at what point the officers would accept his answers and allow him to "part as friends" from the police.

The Defendant was then questioned by these three law enforcement officers, who were not corrections officers. Indeed, the Department of Corrections ("DOC") apparently considered this to be a transfer of control to the WPD when it interrupted the interrogation to ask WPD detectives to sign a form concerning the WPD interview. Furthermore, the DOC relied upon and accepted WPD's assessment of the situation and whether Defendant had actually agreed to be interviewed.[47] Additionally, the Defendant had to be transferred back into DOC control after the detectives were finished interrogating Defendant.

---

[47] Tr. at 44.

17

Moreover, the police officers never told the Defendant that he was free to get up and leave during the interview, return to the prison population, or terminate the interview. The Defendant was essentially given permission to be uninformed; however, he was not told that he had permission to be silent.[48] So too, the police did not reveal the thrust of their interview (the "anything") until several minutes into their questioning.[49]

In viewing the objective circumstances of the Defendant's interrogation, there existed sufficient additional indicia of coercive pressure beyond incarceration itself. A reasonable person would not have felt free to demand that the police stop the questioning or to get up and leave the interview room.[50] Therefore, considering all relevant factors, the Court finds that Defendant was in custody during the interview.

The Court also finds that the police conducted a custodial interrogation. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

---

[48] Tr. at 1. The Defendant was told at the beginning of the interview: "Now if you don't know anything, that's fine and we can part as friends and we'll all move on."

[49] Tr. at 4.

[50] *See Howes v. Fields*, 132 S.Ct. at 1189.

incriminating response from the suspect."[51] It also includes the "functional equivalent" of questioning.[52] Therefore, anything that the police "should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."[53] An incriminating response is any response, whether exculpatory or inculpatory, that the prosecution may seek to present at trial, even if the statement is used only to impeach a defendant's testimony.[54]

Indeed, the State acknowledges the possibility that the interview had the potential to elicit an admission of criminality.[55] The WPD admitted at the suppression hearing that they wanted information about a murder weapon. Accordingly, there was a likelihood that the questions that they asked would invoke an incriminating response. Moreover, the transcript reflects that the detectives essentially told Defendant that denial of February possession of the murder weapon (or, by inference, any exculpatory statement) could lead to "some problems in the future" and suggested that a detective "probably will be reading

---

[51] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[52] *Id.*

[53] *Id.*

[54] *Id.* at n.5.

[55] *See* State's Response, at 3 ("It is the State's position that the Defendant was read Miranda warnings at the proper time – once it because clear that he may touch upon admissions of criminality in a case the police were actually investigating.").

you rights next time" if he did not provide information about the weapon right now during the prison interview.[56]

Here, three police officers questioned and verbally challenged Defendant for approximately one hour prior to his admission to possession of the murder weapon. Although even-toned, the officers were relentless in probing Defendant about his knowledge of the murder weapon. Defendant was clearly interrogated here. While the police are allowed to question a person for an extended period of time,[57] *Miranda* warnings are necessary when a suspect is in custody and interrogated.

The Court also finds that the Defendant was a suspect when the police conducted their custodial interrogation. Although the police testified at the hearing that Defendant was not a prime suspect and that their subjective intent was to obtain information about the murder weapon, the police knew before they went to the prison that Defendant was implicated in the murder of Jerome Green.[58] Indeed,

---

[56] Tr. at 26.

[57] *See, e.g., Howes v. Fields*, 132 S.Ct. 1181 (2012); *State v. Scruggs*, 2016 WL 286386 (Del. Super. Jan. 22, 2016).

[58] Tr. at 36 (emphasis added):
Detective: Okay. Um. It, pretty important information. This is probably the most paramount part of what we're here to talk about. Okay? And I've been working on this case for over a year. All right? And I'm pretty familiar with what happened. Ah. So I'm going to know if you're not telling the truth or if you are telling the truth. Okay? Um, but I'm not as interested at, in – in the person that did this crime as I am about the person who may or may not have paid for this crime. Okay? *And the – the incident that I'm talking about is a homicide.* Okay? I know that you know that's what I was here for when we walked in the door because I've talked to your dad about it. He knows about it. I did a search warrant here for your, for some of your property.

20

after the police elicited Statement A from Defendant, the detectives repeatedly told the Defendant that he had been implicated in Shooting 1.[59] Moreover, the police told Defendant that "I got people ID-ing you now" for the murder.[60]

In addition to suspecting that Defendant was at the scene of Shooting 1 and learning that his name had come up in the murder, the police also knew (or could have ascertained) that his brother was eliminated as a suspect because his brother was in jail when Jerome Green was shot dead.[61] Although the police testified that they did not connect Defendant to either homicide, their intent was to focus on Defendant's involvement in a murder weapon that was used in two homicides and was known to have been in Defendant's possession in two other shootings. The

---

[59] Tr. at 41-43 (emphasis added):

Detective: I mean here's the thing, Rydell. You – you – you can read between the lines. You know what we're getting at.
Mills: Uh huh.
Detective: All right. Your name's come up in this. All right?
Mills: A lot of names came up in it.
Detective: *Yeah, but the most important name was your name and the reason that the most important name is your name is.*
Mills: 'Cause I was always around there. Hanging with them.
Detective: *Right. Right, and, ah. One other reason too is the fact that the gun that you had was the gun that killed Boomer. Okay?*

...

Detective: This is – I mean this is it. This is it. *The gun that you had is the gun that killed Boomer. Your name's come up in it.* You hang with the boys at 22nd and Pine. Kevin, little, Larry's little brother got murdered. Boomer's the killer. I'm not worried about who shot him. I'm worried about who set it up.

[60] Tr. at 43.

[61] Tr. at 77-78.

21

police knew that Defendant had used Shooting 1's murder weapon in Shooting 3. The police clearly wanted information about the possession of the gun during Shooting 1 and Shooting 4 (the other homicide). The police also knew that Defendant had previously misled the police investigation concerning the gun[62] but decided to try to elicit more information about the murder weapon one more time.

Here, the police literally knew (via Defendant's guilty pleas in Shootings 2 and 3) that Defendant had his hand(s) on the murder weapon. They also had reason to question his veracity concerning the accessibility of the gun and there was a reasonable likelihood that Defendant might have been complicit in a gun-related charge, an accessory to a crime, a co-conspirator, or a perpetrator of one of more of the unsolved homicides. The law is clear that irrespective of whether the police suspected that the Defendant was responsible for the homicide in Shooting 1, a crime involving the murder weapon, or for a different crime, applying *Miranda* warnings only to a custodial interrogation in connection with the very case under investigation (i.e., the officers said that they only wanted to know about the use of the gun) "goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights."[63] Defendant was a criminal suspect, he was interrogated, and he was in custody.

---

[62] The transcript references a prior interview with Defendant where he claims that he threw the gun in the river. In view of the fact that the same gun was used to commit Shooting 4 (another murder), Defendant's claim was highly suspicious.

[63] *Mathis v. U.S.*, 391 U.S. 1, 4 (1968).

Under these circumstances, in the absence of *Miranda* warnings, Statement A was involuntary.

Moreover, although the State does not intend to use Defendant's Statement A in its case in chief (thereby honoring the police officers' promise that those statements would not be used against him),[64] the involuntary nature of Statement A is a factor in determining whether Statement B was voluntary and admissible.

Hence, the ultimate evidentiary issue[65] before the Court in this case is whether *Miranda* warnings, recited to a suspect in the middle of a custodial interrogation (after Statement A and before Statement B), were effective. The Court finds that, in the instant case, the *Miranda* warnings were not effective. Thus, Defendant's post-*Miranda* statement (Statement B) is inadmissible in the State's direct case.

Where a statement is interrupted by *Miranda* warnings and then continues post-*Miranda*, the law looks to whether the second statement (Statement B) is separate and distinct from the first line of questioning and answers (Statement A).[66] *Missouri v. Siebert* provides guidance in this analysis. "The threshold issue when

---

[64] State's Supp. at 1. The State concedes that the police did not - and could not - confer total immunity as to Statement A: "the Court astutely identified a real life scenario where such statements are routinely used as both mitigation and arguments for aggravation at a defendant's sentencing." *Id.*

[65] The State does not intend to use Statement A in its direct case.

[66] *State v. Wright*, 2009 WL 3068914, at *6 (Del. Super. Sept. 14, 2009).

23

interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."[67] The *Missouri* Court continued: "Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?"[68]

*Missouri v. Siebert* directs us to evaluate several factors to determine whether subsequent *Miranda* warnings effectively allow Defendant to voluntarily choose to continue speaking.[69] These factors include the substance of the pre-*Miranda* interview, "the overlapping content of the two statements," the juxtaposition of the statements, the "continuity of police personnel," and "the degree to which the interrogator's questions treated the second round as continuous with the first."[70]

The transcript reflects that the substance of the pre-*Miranda* and post-*Miranda* questions was nearly indistinguishable and any break was practically

---

[67] *Missouri v. Siebert*, 542 U.S. at 611-12.

[68] *Id.* at 612.

[69] *See id.* at 613 ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.")

[70] *Id.* at 615.

imperceptible. The police treated Statement B as a continuation of its investigation into a series of shootings, albeit with Defendant abandoning his claim of ignorance about the weapon. In fact, near the conclusion of the questioning in Statement B, the police summed up the course of their entire interview. The police said:

> Okay. All right. Anything else you can think of that I – I haven't asked you yet about? I mean it's pretty important stuff. *I mean you came a long way today from when we first started.* You understand why we pushing you so hard because we knew you had these answers in you know and we didn't want to see you, you know, take this fall. Right? I mean you understand that? All right.[71]

Clearly, the substance of the pre-*Miranda* interview centered around the location, possession, and use of a particular Ruger nine millimeter gun between February and October 2008. Prior to the interview, the police knew that this gun was a murder weapon, that Defendant was involved with the gun, and that Defendant was involved in known criminal activity with the gun (he pled guilty to Shootings 2 and 3). The interrogation was detailed and went on for approximately one hour. During that time, the police made it clear that they suspected that Defendant was involved with handling and dispatching the murder weapon. The substance of the pre-*Miranda* interrogation involved the detectives' desire to facilitate solving two unsolved murders.

Additionally, the contents of the pre-*Miranda* questions, post-*Miranda* questions, and the answers to both revolved around the murders and the murder

---

[71] Tr. at 83 (emphasis added).

weapon. Statement A and Statement B were substantially overlapping and inextricably linked to the two unsolved murders. Moreover, the police acknowledged that Statements A and B are interconnected. They told Defendant that they wanted to talk to Defendant "a little more in depth,"[72] thereby indicating that his previous answers in Statement A had only skimmed the surface of their investigation. Although *Miranda* warnings were given after one hour, the interrogator's questions treated Statement B as continuous with Statement A. Indeed, the officers referred to and pointed out the contradictions in Statement A during Statement B.[73] Furthermore, police references to Statement A (which they assured him would have no negative consequences) implied and could be interpreted by a suspect to mean that repetition, elaboration, or an in-depth explanation of the earlier statement might not be incriminating, either, but that any other information would be the subject of the *Miranda* warnings.[74]

---

[72] Tr. at 35.

[73] Tr. at 43:
> Mills: I got the gun from him.
> Detective: Okay. Some time in February-ish?
> Mills: February and.
> Detective: Between February and April?
> Mills: April, yeah.
> Detective: Well, coincidentally that's when [Jerome Green] was killed. Okay? And, you know, I got people ID-ing you now.

[74] *State v. Mattison*, 2005 WL 406342, at *2; *Missouri v. Siebert*, 542 U.S. at 602.

26

Additionally, unlike cases cited by the State, there was no temporal or spatial break between Statement A and Statement B. Statement B seamlessly flowed from Statement A and immediately followed Statement A. Additionally, both statements were conducted in the same location (a prison office) and under the same conditions (WPD in control).

Similarly, the same three law enforcement officers who elicited Statement A were the same three post-*Miranda* officers who questioned Defendant for an additional half hour. Working as a team, they proceeded without pause to recite *Miranda* warnings and elicit Statement B.

The law is clear that the Court must look to the totality of the circumstances to determine whether *Miranda* warnings are necessary.[75] Here, the circumstances are that three detectives presented themselves to a prison and announced that they wanted to speak with Defendant, age 17, who was recently housed at the prison. The Defendant's routine was interrupted and he was escorted, without any notice, to a prison office. Three WPD detectives (who were not corrections officers) were waiting for him. They did not advise him of his *Miranda* warnings, tell him that he could refuse to talk or return to his prison routine, or indicate when they would be through with him. During the course of the next hour, the detectives told him several times that they would not use his statements against him but they did not

_____

[75] *DeJesus v. State*, 655 A.2d at 1190 (Del. 1995).

27

tell him that he was free to leave or free to end the questioning. They then conducted a detailed and relentless inquiry into the ownership, possession, and possible transfer of a murder weapon between February and October 2008 (Statement A). It is also undisputed that the police advised him of his *Miranda* rights only after Defendant admitted to possession of the murder weapon around the time of the first murder. Based on Defendant's guilty pleas and admission of possession of the gun in Shootings 2 and 3, there was a likelihood that Defendant was involved with the gun around the time of Shooting 1 (for which he was eventually indicted).

## Conclusion

The Court recognizes that detective work is difficult and that dedicated officers desire to solve crimes, particularly murders; however, considering the facts of the case and in the absence of *Miranda* warnings, it is not clear that the Defendant "exhibit[ed] some understanding that he was not compelled to cooperate."[76]

Defendant's first statement (Statement A) was involuntary because it was a custodial interrogation of a suspect without *Miranda* warnings. While acknowledging that the State will not use Statement A in its case in chief, in view of the fact that Statement B immediately followed Statement A, no time passed

---

[76] *State v. Wright*, 2009 WL 3068914, at *5 (Del. Super. Sept. 14, 2009).

28

between confessions, there was no change in the place of interrogations, there was no change in the identity of the interrogators, and the police referenced Statement A as it elicited Statement B, the post-*Miranda* statement was not the product of an effective waiver. Indeed, after the officers confronted Defendant with his inadmissible Statement A, Statement B appeared to be a continuation of earlier questions with higher stakes (murder) with *Miranda* warnings. Under the circumstances, the *Miranda* warnings were ineffective and did not truly convey to Defendant that he was not compelled to answer questions or that he had a choice to stop talking, terminate the interrogation, or leave.

Accordingly, Defendant's Motion to Suppress Evidence is **GRANTED**.

**IT IS SO ORDERED**.

Judge Diane Clarke Streett

Original to Prothonotary

cc: Matthew B. Frawley, Esquire, Deputy Attorney General
Mark Denney, Esquire, Deputy Attorney General
Eugene J. Maurer, Jr., Esquire
Allison S. Mielke, Esquire